IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| SYLVIA MICHAELSON, | ) | 4:04CV3299 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| JO ANNE B. BARNHART, | ) | |
| COMMISSIONER of the SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

A social security claimant asserts that fibromyalgia, depression, and pain render her disabled. As there are no conclusive tests to affirm the presence or effect of fibromyalgia, the finding of no disability rests largely on the discounting of the claimant's credibility. Is this a situation in which there is sufficient evidence to support two contrary results–the Commissioner's decision to deny benefits or a finding of disability–with the result that I affirm the Commissioner because a "tie"[1] goes to the Commissioner? Or is this an case in which the record is incomplete regarding a critical matter, requiring remand?[2] Upon careful review of the record, I conclude that remand is required because the ALJ failed to fully develop the record and improperly evaluated the claimant's credibility by ignoring record evidence of the claimant's use of pain medication.

---

[1] Under the familiar standard of review, "[i]f, after reviewing the record, the Court finds that it is possible to draw two inconsistent conclusions from the evidence and one of those positions represents the Commissioner's findings, the court must affirm the Commissioner's decision." Charles v. Barnhart, 375 F.3d 777, 782 (8th Cir. 2004). The court must also review the decision of the Commissioner to decide whether the proper legal standard was applied in reaching the result. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992).

[2] The "tie goes to the Commissioner" approach presumes that the record was fully developed in all material respects.

# I.  BACKGROUND

This suit involves two applications under the Social Security Act (the "Act"). The first is an application for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401 et seq.  (Tr. 401-03.)  The claimant's insured status for Title II benefits expired on June 30, 2001.  (Tr. 424.)  The second is an application for supplemental security income (SSI) benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq.  (Tr. 752-55.)  Michaelson protectively filed her application for benefits on September 17, 2001.  (Tr. 401-03, 751-55.)  At the administrative hearing, she amended her alleged onset date to March 17, 2000, due to a previous denial of benefits.  (Tr. 838.)  The ALJ found that the claimant had severe medically determinable impairments:  fibromyalgia, major depression (moderate) and migraine headaches.  (Tr. 37.)

An understanding of fibromyalgia is needed for proper resolution of this case. "Fibromyalgia . . . is pain in the fibrous connective tissue components of muscles, tendons, ligaments, and other white connective tissues . . . ." Kelly v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998) (the ALJ erred in disregarding treating physician's diagnosis of fibromyalgia).  The Eighth Circuit has recognized that fibromyalgia is a potentially disabling disorder because of pain, sleep derangement, and resulting daytime fatigue. Brosnahan v. Barnhart, 336 F.3d 671, 678 (8th Cir. 2003) (citing Kelley, 133 F.3d 583 at 589).)  As "there are no confirming diagnostic tests", a fibromyalgia diagnosis is "usually made after eliminating other conditions . . . . According to the ACR's [American College of Rheumatology's] 1990 standards, fibromyalgia is diagnosed based on widespread pain with tenderness in at least eleven of eighteen sites known as trigger points." Brosnahan, 336 F.3d at 672 n.1. "Treatments for fibromyalgia include cold and heat application, massage, exercise, trigger-point injections, proper rest and diet, and medications such as muscle relaxants, antidepressants, and anti-inflammatories." Id. With this understanding of

fibromyalgia as background, I note only the salient points of the medical record and ALJ's findings.

The record includes medical evidence considered by the state agency at the initial and reconsideration levels as well as new evidence not considered by the state agency. As for the medical evidence considered by the state agency, the ALJ extracted from the state agency's summary of the record rather than creating her own summary of the record.[3] (Tr. 30-32.) The ALJ's opinion includes this statement: "The state agency noted . . .[that a] '[medical source statement dated 10/29/01 states that the claimant's fibromyalgia prevents her from working. However, the claimant's symptoms outweigh the physical findings.'" (Tr. 31 (referencing January 18, 2002 physical residual functional capacity assessment found at Tr. 528).) Thus the state agency's initial determination that Michaelson was not disabled, and the ALJ's later ruling, were based in part on totally rejecting a medical source statement that Michaelson's fibromyalgia prevents her from working. Yet this medical source statement is not in the record.

The ALJ also considered new medical evidence not considered by the state agency examiners. (Tr. 32-35.) Although she found it incomplete, she did not further develop the record. She also misread the record.

At the hearing, Michaelson's counsel advised the ALJ that she had been unable to get updated medical records, particularly those of Michaelson's treating psychiatrist, Jyotsana Sharma, M.D. She asked the ALJ to subpoena them but the ALJ indicated that "I'm not going to do a subpoena yet, if you're just in the process of getting them [medical providers] the correct releases. So why don't you work on it for 30 days and see what you can get done." (Tr. 837.)

---

[3]This is not error if the ALJ fully reviewed the evidence before the state agency.

The ALJ's opinion commented on the absence of treatment records from Dr. Sharma. (Tr. 32 ("no mental health treatment records were submitted from the mental doctor nor the therapist" regarding depression).)  The ALJ also reviewed but gave little weight to two reports by Dr. Sharma completed in October 2003, finding the reports inconsistent as they indicated marked limitations in concentration and activities of daily living but rated Michaelson's work-related ability as fair to good. (Tr. 32.)

The ALJ further observed that there was an "18-month gap in medical treatment, between January 21, 2000 and June 29, 2001," and cited this gap in treatment as a reason for discrediting Michaelson's allegations of disabling pain. (Tr. 33 (noting that Michaelson was not in any type of treatment and not on medications in November 2001); Tr. 34-35 (specifically noting the gap in treatment and citing regulations providing that a claimant must provide medical evidence of impairments sufficient to determine the nature and limiting effect of impairments).)  This gap in treatment (which resulted from the ALJ's misreading of the record, as I will explain) was significant because Michaelson alleged a March 17, 2000 onset date and her insured status for Title II benefits expired June 30, 2001.

## II.  ANALYSIS

Among other arguments, Michaelson asserts that the ALJ failed to properly develop the record and misread the record.  Finding these arguments persuasive, I do not reach Michaelson's other arguments (Filing 22, P.'s Br. at 3), other than to note how misreading the record made an adequate credibility assessment impossible.

### A. Failure to Develop the Record

The Commissioner does not dispute that the ALJ relied upon the physical residual capacity assessment of the state agency, that this assessment included a

-4-

statement from a medical source dated October 29, 2001 indicating that the claimant's fibromyalgia prevents her from working, that the state agency rejected this medical source statement as unsupported by the evidence, and that this medical source statement is missing from the record. (Tr. 27 (Def.'s Br.) at 28.) The Commissioner asserts that the ALJ did not have a duty to locate this missing medical source statement, because it is the claimant's burden to establish disability. (Id.) I disagree, under the peculiar circumstances of this case.

The state agency's assessment was contained in a physical residual capacity assessment form. A section of that form addresses treating or examining source statements and requires the state agency consultant to state whether there is a treating or examining source statement on file which contains limitations or restrictions significantly different from the consultant's findings. If there is, the form requires the state agency consultant to explain "why those conclusions are not supported by the evidence in the file," and to "[c]ite the source's name and the statement date." (Tr. 528.)

The ALJ's failure to obtain the missing October 29, 2001 medical source statement was problematic because neither the state agency consultant nor the ALJ explained why the conclusions in that statement were deemed unsupported by the evidence. In the absence of the medical source statement, there can be no effective review of the ALJ's apparent conclusion that the state agency examiners were correct to conclude that the conclusions of the missing medical source statement were unsupported by the evidence.

An ALJ has a duty to fully and fairly develop the record, even when the claimant is represented by counsel. Bowman v. Barnhart, 310 F.3d 1080, 1082-85 (8th Cir. 2002). This duty arises because "Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits . . . ." Sims v. Apfel,

-5-

530 U.S. 103, 110-11 (2000).  Here, the ALJ's failure to obtain the missing medical source statement was error.  This is particularly so because the other medical data was equivocal.  The only evidence from treating psychiatrist Dr. Sharma was two reports, discounted by the ALJ as internally inconsistent.  (Tr. 32.)[4]

### B.  Misreading of Record Taints Credibility Assessment

To assess a claimant's credibility, the ALJ must consider all of the evidence, including prior work records and observations by third parties and doctors regarding daily activities, the duration, frequency, and intensity of pain, precipitating and aggravating factors, the dosage, effectiveness, and side effects of medication, and functional restrictions.  Lowe v. Apfel, 226 F.3d 969, 971-72 (8th Cir. 2000) (citing Polaski).  The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole.  Id. at 972.  Where adequately explained and supported, credibility findings are for the ALJ to make.  Id. (citing Tang v. Apfel, 205 F.3d 1084, 1087 (8th Cir. 2000)).

One reason the ALJ gave for discounting Michaelson's credibility was an "18-month gap in medical treatment, between January 21, 2000 and June 29, 2001."  (Tr. 34.)  However, there was no gap in treatment.  During this time period, Michaelson was seen at least eight times by her doctors, and was taking muscle relaxants, antidepressants, and anti-inflammatories.  These medications were all  under active management and are exactly the medications typically used in treating fibromyalgia.  Tr. 567, 570-76; Brosnahan, 336 F.3d at 672 n.1.

\

---

[4]Notably, the ALJ bemoaned the absence of treatment records from Dr. Sharma despite refusing a request at the hearing to subpoena those records.  (Tr. 32 (ALJ opinion), 837 (transcript of hearing).)  This is further evidence of a failure to fully develop the record.

On March 24, 2000, a "relapse" of fibromyalgia was noted. (Tr. 577). Fibromyalgia was still "active" on September 13, 2000. (Tr. 573.) Michaelson sought a referral to a therapist for worsening depression on December 4, 2000. (Tr. 574.) Though depression improved, it continued. (Tr. 572, 570.) There was concern about the continued, long-term use of controlled substances for pain relief on July 31, 2000. (Tr. 576.) Morphine was prescribed on December 4, 2000. (Tr. 574.) On June 6, 2001, Dr. Weeks noted the need to wean her off narcotic analgesics and a muscle relaxant as he would not write those prescriptions long-term. (Tr. 569.) On June 28, 2001, Dr. Weeks referred Michaelson for evaluation to see whether referral to a pain management clinic was appropriate. (Tr. 567.) Michaelson's credibility regarding allegations of disabling pain cannot be adequately assessed without consideration of the active management of her pain and depression medication during the eighteen-month period mistakenly overlooked by the ALJ.

## III. DECISION

For the reasons stated, I find that the Commissioner's decision failed to apply the proper legal standard and was contrary to law. Accordingly,

IT IS ORDERED that the decision of the Commissioner is reversed, and the cause is remanded for further development of the record and consideration of evidence from the eighteen-month period mistakenly ignored by the ALJ. Judgment will be entered by separate order.

September 23, 2005.                         BY THE COURT:

                                            s/Richard G. Kopf
                                            United States District Judge